# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00532-CR

**Paul Frank Weir, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF BELL COUNTY, 27TH JUDICIAL DISTRICT
NO. 53,126, HONORABLE MARTHA J. TRUDO, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

A jury found Paul Frank Weir guilty of possession of more than one gram but less than four grams of methamphetamine. *See* Tex. Health & Safety Code Ann. '' 481.102(6), 481.115(c) (West Supp. 2003). The court assessed sentence at ten years in prison. He contends that the evidence is factually insufficient to support the verdict. We affirm the judgment.

It is undisputed that Weir possessed a cigarette box that contained one to four grams of methamphetamine. The only disputed issue is whether he knew what the box contained. Four witnesses testified regarding this issue; other witnesses at trial testified regarding issues not disputed on appeal. Three witnesses testified from their personal knowledge of the events surrounding Weir=s arrest: Milton Shelton, a Wal-Mart loss prevention officer; Manfred Stinehour, an off-duty Killeen police officer who worked at

Wal-Mart; and Weir. The fourth witness, Temple police officer Dan Kallus, testified generally about the manufacture of methamphetamine and behaviors of individuals associated with its production and distribution.

When conducting a factual sufficiency review, we do not view the evidence in the light most favorable to the verdict. *Johnson v. State*, 23 S.W.3d 1, 6-7 (Tex. Crim. App. 2000). Instead, we consider all evidence in a neutral light while deferring to the jury as the sole judge of the weight and credibility given to witness testimony. *Id*. at 7. We will set aside a verdict only if the proof of guilt is so obviously weak or so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id*. at 7; *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); *Shelton v. State*, 41 S.W.3d 208, 211 (Tex. App.CAustin 2001, pet. ref=d). A court of appeals should reverse on factual insufficiency grounds only when the jury verdict is manifestly unjust, shocks the conscience, or clearly demonstrates bias. *Clewis*, 922 S.W.2d at 135.

Shelton testified that Weir was one of the first persons he apprehended while working for Wal-Mart. Shelton testified that on April 23, 2001 he saw Weir put the contents of three boxes of Suphedrine[1] tablets in his shirt sleeve. Suphedrine is designed to be used as an antihistamine, but can be used to manufacture methamphetamine. Wal-Mart limits customers to three boxes per purchase in order to deter manufacture of methamphetamine; people wanting to make methamphetamine therefore often steal drugs such as Suphedrine. Shelton testified that Weir caught his attention because he had Suphedrine and because he was looking around and leaning over on his shopping cart. Shelton said that Weir walked around the store and pulled the sheets of tablets out of the boxes, put the sheets into his shirt, and put the empty boxes into a freezer case behind other products. Weir paid for other products but left without paying for the Suphedrine. Shelton apprehended him outside the store; Weir resisted returning to the store. Shelton removed sheets of Suphedrine tablets from Weir=s shirt. Pursuant to company policy, Shelton then explained to Weir that he was banned from entering any Wal-Mart; if he entered the store again he would be cited for criminal trespass. The State introduced a statement to that effect signed by Weir. In rebuttal, Shelton testified that Weir had more than $800 in his possession at the time of the shoplifting arrest.

On November 10, 2001, Shelton was working in the same Wal-Mart with fellow officer Stinehour. Shelton recognized Weir and told him he would be arrested for trespass. He took Weir to the office at the front of the store. Weir was upset at being detained because the shoplifting charges were dropped. Shelton testified that Weir was wearing a button-down shirt with a pocket on the left chest; Shelton could not remember if the shirt had a pocket on the right side. Shelton testified that Stinehour found

---

[1] Suphedrine is the generic equivalent of Sudafed; both products contain pseudoephedrine.

a cigarette box in Weir=s shirt pocket; the box contained a white powdery substance in a plastic bag. Shelton indicated that Weir said that a friend gave him the cigarette box, but Shelton testified that Weir did not give the name or any information about that person. Shelton testified that he did not see anyone accompanying Weir in the store. Shelton also testified that he found a metal spoon in Weir=s boot.

Stinehour testified that Weir=s shirt had pockets on both sides of the chest, but did not recall whether the one on the right contained cigarettes. He said that Weir=s demeanor did not change noticeably when Stinehour found the plastic bags containing a yellowish crumbly substance in the cigarette box in appellant=s left shirt pocket. Stinehour testified that he routinely pursued evidence of others involved in crimes when given that evidence by an arrestee, but that Weir gave him no specific information to pursue such as names, addresses, or descriptions of anyone else involved in the incident. Stinehour testified that the only specific information Weir gave him is that the cigarette box and its contents had been given to him in the parking lot and were not his.

Kallus testified generally about the manufacture and trafficking of methamphetamine. Methamphetamine is derived from pseudoephedrine and other substances. About 70-75 tablets of pseudoephedrine will yield a gram of methamphetamine, which will sell for about $100; 1800 pseudoephedrine tablets will yield about an ounce of methamphetamine. Because stores limit customers to buying three to six boxes of pseudoephedrine at once, people assisting the manufacture of methamphetamine will often steal the tablets in order to gather the necessary amounts quickly. He testified that suppliers and methamphetamine cooks often have long-term relationships, and that methamphetamine addicts almost never quit on their own. He admitted that pseudoephedrine has a legitimate purposeCas an

4

antihistamineCfor which it is commonly used, and that purchasing it in small amounts, or even stealing a single package would not necessarily mean involvement in the methamphetamine trade. Kallus admitted that he had no personal knowledge of Weir or the facts of this case.

Weir testified that his April 2001 arrest was based on misunderstandings and a bad sequence of events. He said he was having some personal problems, was tired from working, and had bad allergies. He picked up one box of antihistamines, opened the package, took two pills, and began shopping. Sensing that he was being followed, he put the box into the freezer case; on cross-examination, he conceded that he put the partially used sheet of pills into his clothing. He denied hiding other pills in his shirt. He also did not recall being banned from the store. He testified that his shoplifting charge was dismissed.

Weir testified that he stopped by the Wal-Mart in November 2001 while returning to his home in Copperas Cove from Belton where he was doing some welding work on a tractor used by workers who were reconstructing his driveway. Weir said he was wearing a shirt with snaps rather than buttons so that, if the shirt caught on fire while he was welding, he could quickly shed it. Several young men gave Weir a ride home from the Belton worksite. They stopped to buy some items at the Wal-Mart. Weir said he was arguing with Johnny, one of the passengers who had sold him a truck that turned out not to belong to Johnny; Weir said he did not know Johnny=s last name and had no idea that Johnny was one of the biggest methamphetamine dealers in Bell County. Another boy, possibly called Eddie, asked Weir to carry a box of cigarettes into the store because Eddie=s shirt did not have pockets. Weir never looked inside the box.

5

Weir said he was in line at the register to pay for a purchase when Milton interceded to arrest him for trespassing.

Weir offered explanations for indicia of guilt. Weir explained that he had $438 in cash on him in November because he had just been paid for welding, not because of drug sales. He explained that he had a plastic[2] spoon because he had been eating take-out food when he got a ride home. He testified that he did not give the officers the names of his companions because he did not know their names; he testified that he did describe them and their vehicle. He testified that the officers disregarded his story. He admitted that he might not have believed his version of events if he had not lived it.

Although Weir presented a version of events consistent with his innocence, the other witnesses presented a version of events consistent with his guilt. Resolving this conflict in evidence required the jury to make credibility choices, and they chose to believe the State=s witnesses. We cannot substitute our judgment for the jury=s choices. *See Johnson*, 23 S.W.3d at 7. Nor can we reverse the judgment unless it is so contrary to the overwhelming weight of the evidence as to be clearly wrong, manifestly unjust, shocking to the conscience, or clearly the result of bias. *See Clewis*, 922 S.W.2d at 129, 135. Weir undisputedly possessed the box of methamphetamine and had engaged in behavior consistent with involvement in the methamphetamine trade. Viewing the evidence neutrally, we find that the jury could

---

[2] The inventory of his belongings completed upon his arrest does not specify the material of the spoon. Shelton testified that the spoon was metal.

make credibility choices and determine beyond a reasonable doubt that Weir knowingly possessed the methamphetamine.

We overrule his sole point of error and affirm the judgment.


Jan P. Patterson, Justice

Before Justices Kidd, Yeakel and Patterson

Affirmed

Filed:   April 24, 2003

Do Not Publish